UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
In re:

SUNIL PARIKH,

Case No. 807-72869-reg

                           Debtor.

Chapter 7

-------------------------------------------------------------------x
JOHN DESIDERIO,

                           Plaintiff,

Adv. Proc. No. 808-8062-reg

v.

SUNIL PARIKH,

                           Defendant.
-------------------------------------------------------------------x

## DECISION AFTER TRIAL

Before the Court is an adversary proceeding commenced by John Desiderio (the

"Plaintiff"), seeking to dismiss the Debtor's petition as a bad faith filing pursuant to 11 U.S.C.

§707(a), or alternatively, to deny the Debtor's discharge pursuant to 11 U.S.C. §§ 727(a)(2)(A),

727(a)(3), 727(a)(4)(A), 727(a)(4)(B), 727(a)(4)(D), 727(a)(5), and/or 727(a)(6)(A).[1]  With

respect to the relief sought under section 707(a) the Plaintiff alleges, in sum, that the Debtor filed

this bankruptcy case in bad faith and solely as part of a scheme to impede the Plaintiff's efforts to

collect on a series of judgments entered against the Debtor in Plaintiff's favor.  In support of the

section 727 causes of action, the Plaintiff argues that the Debtor fraudulently transferred assets

within the year preceding the bankruptcy filing with the intent of defrauding creditors; the Debtor

failed to preserve financial records from which his financial condition or business transactions

---

[1]        The second and third causes of action asserted by the Plaintiff in the complaint, under 11
        U.S.C. §§ 523(a)(2)(A) and (B), were withdrawn at the conclusion of trial.

could be examined; the Debtor knowingly and fraudulently omitted assets and liabilities from his schedules and statements, and gave knowingly false testimony at the section 341 meeting; the Debtor failed to satisfactorily explain the loss of assets sufficient to meet his liabilities; and the Debtor failed to obey a lawful order of this Court.

The Debtor argues that the Plaintiff failed to satisfy his burden of proof at trial. He maintains that he made repeated offers to settle with the Plaintiff but those offers were rejected. According to the Debtor, this bankruptcy case was filed in response to the Plaintiff's efforts to have the Debtor incarcerated pursuant to a state court warrant of commitment. The Debtor also argues that his education, experience and sophistication must be taken into consideration when examining the causes of action under section 727(a), and in this case, those factors weigh in the Debtor's favor. According to the Debtor, his lack of formal education and business experience, and the fact that English is not his first language, are justification for most of the deficiencies in this case. The Debtor admits that certain information was omitted from his schedules, but maintains that those omissions were inadvertent, not fraudulent. He also claims that he did not review his petition before signing it because he was under duress resulting from the threat of incarceration, and maintains that this duress persisted at the point of his section 341 meeting. The Debtor argues that the information omitted from his schedules was or should have been known to the Plaintiff, and the mistakes were subsequently corrected by amended schedules. Finally, the Debtor contends that the Plaintiff's claims are barred by the doctrine of judicial estoppel because the Plaintiff, in a related malpractice lawsuit, acknowledged that the Debtor owned no significant assets.

The Court held a trial over several days from November 2009 through June 2010. The

Plaintiff called five witnesses: Harendra Koya, accountant; Sunil Parikh, the Debtor; Meena Parikh, the Debtor's wife; and Lynda Fergesun, a friend of the Plaintiff's counsel. The Debtor offered no witnesses. The Plaintiff's Exhibits 1 through 8 and Debtor's Exhibits A through J were received into evidence without objection prior to the commencement of the trial. At trial, Plaintiffs exhibits 23, 28 B&C, 29, 29A, 31, 32-33, 39, 40, 42, 43, 45, 46, 53-58, 61, 63, 69, 71, 72 and 79 were admitted, some for limited purposes only.[2] Defendant's Exhibits V and an unmarked Settlement Stipulation were admitted.[3]

On July 23, 2010, the Plaintiff and Debtor each filed proposed findings of fact and conclusions of law and post-trial memoranda of law. On July 26, 2010, the Plaintiff filed a response to the Debtor's proposed findings of fact and conclusions of law.[4]

In this case, the Court has been presented with facts which are relevant to proving a case for dismissal under section 707(a) and also denial of the discharge under section 727(a)(4)(A) and (a)(2)(A). After considering the evidence and weighing the credibility of the witness, the

[2]     Exhibits 54-58 were admitted for the limited purpose of showing what information was given to the accountant, H.K. Koya, in connection with one of the transactions in this case. Plaintiff's Exhibits 10, 37, 46-50, 60, 66, 77 and 79 were discussed at trial but not admitted.

[3]     Defendant's Exhibits K, P, T and a Letter, dated May 25, 2005, were discussed at trial but not admitted.

[4]     The Debtor has asked the Court to strike the Plaintiff's July 26th response because responsive papers were not authorized by the Court. In response, the Plaintiff argues that his response was appropriate considering that the Defendant failed to provide the Plaintiff with his proposed findings of fact and conclusions of law prior to submission. Although the Court admonishes Plaintiff's counsel for filing the responsive document after the deadline and without permission, it will not be stricken from the record. Proposed findings of fact and conclusions of law are merely an aid to the Court's navigation and organization of the facts and legal issues presented in the case and are not a substitute for the Court's own review of the record of the case or the Court's independent review and analysis of the legal issues presented.

Court finds that the Plaintiff has sustained his burden of proof to dismiss this case "for cause" as a bad faith filing under section 707(a). However, the Plaintiff also has sustained his burden of proof to deny the Debtor's discharge under section 727(a)(4)(A) and (a)(2)(A).

The Plaintiff has stated to the Court that he would prefer that this case be dismissed under section 707(a) as a bad faith filing. Despite the Plaintiff's preference, the Court must find that dismissal would be in the best interest of all parties in interest in order to dismiss the case. The Court finds that it is in the best interest of all parties that this case remain open and under the supervision and control of the chapter 7 trustee and the Court. The Court also believes that where relief is requested under section 727(a) and the burden of proof is met, it is more appropriate to grant relief under that section than it is to dismiss the case for a bad faith filing. Although the conduct necessary to prove claims under section 707(a) and 727(a) overlaps in some instances, section 727 is the more specific of these statutory provisions and it carries a much harsher penalty. Congress has determined that if a debtor engages in conduct which is specifically proscribed by one of the subsections of section 727(a), the appropriate remedy is the more severe sanction accompanying a denial of discharge. This Court will not alter what it believes is the clear construction of the relevant statutes and apply a lesser remedy, such as dismissal.

## Jurisdiction

This adversary proceeding is a core proceeding and this Court has jurisdiction over this matter pursuant to 11 U.S.C. §§ 157(b) and 1334(b). The following constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## The Bankruptcy Petitions and Schedules

Prior to the instant chapter 7 petition, the Debtor filed a chapter 13 petition on May 30, 2006 with the assistance of experienced legal counsel (Bankr. E.D.N.Y. No. 806-71203). Among the personal property listed on Schedule B in that case was $50 cash; a Citibank checking account (account number ending in X9420) owned jointly with the Debtor's spouse which held a balance of $146.67; household goods; wearing apparel and miscellaneous jewelry with nominal value ascribed to them. Five months later, on October 18, 2006, the Debtor filed an amended Schedule B disclosing Chase checking and savings accounts (account numbers ending X3639-65) held jointly with his spouse with a balance of $22.44. At that time, he also disclosed "Stock & Business Interests" in Health Heaven, Inc. (50%) and Kuliwala Food Corp. (70%), both with unknown value.

In the chapter 13 case, the Debtor also scheduled first and second mortgage liens on his residence in favor of Wells Fargo and Citibank, respectively, totaling approximately $200,000, plus a third mortgage to "Meera Management LLC"[5] in the amount of $300,000. The Debtor also scheduled two secured judgment liens owed to the Plaintiff, John Desiderio, in the amounts of $7,062.50 and $76,143.97. The Debtor reported Peter Devani as a co-debtor with respect to the Desiderio judgments, and reported Meena Parikh, his wife, as a co-debtor on the first and second mortgages, but not the third mortgage. The Debtor reported $0 in unsecured debt. However, on August 4, 2006, he filed an amended Schedule F reporting a $181.45 debt owed to Long Island Power Authority for utilities, and then on October 18, 2006 the Debtor filed a further

---

[5]     The chapter 13 petition actually refers to a third mortgage held by "Meela" Management, not Meera. However, subsequent filings in this case have proven that Meera is the correct name.

amendment to Schedule F adding a Discover Credit card with a balance of $52.32. On Schedule
I, he reported that he was a manager of Mineola Health Food Inc. for a period of one year prior to
the petition, and disclosed $0 in "gross wages, salary or commissions" and $866.66 of monthly
"regular income from operation of business . . . ." He reported his wife's income from her
employment as a lab technician for NYC Health & Hospital Corp. but also reported that she
earned $2,500 monthly "regular income from operation of business..." Schedule J states that his
monthly payment on his first mortgage is $823.73, and $550 on the second mortgage.

The chapter 13 case was dismissed on November 2, 2006 on the motion of the Chapter 13
Trustee.[6]

In December 2006, approximately six weeks after the Debtor's chapter 13 case was
dismissed and seven months before filing the Chapter 7 case, the Debtor or his wife obtained a
$45,000 cash advance from their Citibank Variable Rate Equity Source Account ("Citibank
VRESA") which depleted the available credit on this account. The funds were deposited into an
individual checking account held by the Debtor's wife at Washington Mutual.

On July 30, 2007, about nine months after the Chapter 13 case was dismissed, the Debtor

---

[6]     During the Chapter 13 proceeding, the Debtor objected to the proof of claim submitted
by the Plaintiff in the amount of $183,596. The Debtor argued that the documentation
attached to the proof of claim only supported a claim of $43,286. The Court reserved
judgment on the claim objection but never decided it because the Trustee's motion to
dismiss was granted at a hearing on September 28, 2006. Subsequent to the Court's
granting of the Trustee's motion to Dismiss the case, but prior to the entry of the order
dismissing it, the Plaintiff served Michael Macco, the Chapter 13 Trustee, with a
restraining notice, requiring the Trustee to withhold funds collected from the Debtor
rather than turn them over to the Debtor. In November 2006, the Trustee brought an
action against the Plaintiff for contempt of Court. After a hearing, Judge Bernstein
ordered that the dismissal of the case be amended to provide fees to the Trustee and the
Debtor's attorney of $1,000 each and for the remaining $4,250 to be turned over to the
Plaintiff.

filed the instant chapter 7 petition with the assistance of different, but also experienced, legal counsel. In the schedules filed with the petition, the Debtor disclosed his interest in Health Heaven, Inc., but not Kuliwala Food Corp. Six weeks later, on September 17, 2007, the Debtor filed amended schedules disclosing that he held an interest in Kuliwala Food Corp., but only as a nominee. The schedules as originally filed did not disclose Citibank or Chase bank accounts even though they were previously identified in the chapter 13 schedules. Nor did the Debtor list the third mortgage to Meera Management among his secured obligations, although he did note in the statement of financial affairs that there was a pending action to foreclose the third mortgage, which was "to be discontinued." Although the Debtor did schedule the Plaintiff's judgment liens – this time in the amount of $150,702.72 – the Debtor did not list Mr. Devani as a co-debtor. On Schedule I the Debtor stated that he was a "cashier" at Mineola Health Food earning $800 per month in "wages or salary." He did not report his income as "regular income from operation of business" nor did he report any income for his wife under that category. Schedule J shows that the debtor's first and second mortgage payments were $1,700 and $880, respectively (a total $1,200 increase from the chapter 13 petition). At the section 341 meeting, the debtor testified that these were his correct mortgage payments. However, the Debtor's bank records indicated that the payments were for $823.73 and $870.82 respectively, and the Debtor amended his schedules to reflect these values on January 27, 2009.

On September 5, 2007, the Debtor was questioned by the chapter 7 trustee at the section 341 meeting of creditors at which time the Debtor testified under oath that he was not owed any money, that he had no right to sue anyone for money and that he had never been self employed or engaged in his own business. However, as became evident in subsequent amendments to the

schedules the Debtor was owed money by Peter Devani, Saroj Patel and David Giuffrida. The Debtor's explanation for these omissions was that he was advised by his former counsel, Solomon Lowenbraun, to try to resolve matters with the Plaintiff first, presumably before trying to recover money from other parties, and that for this reason he did not disclose in his schedules the debts that were owed to him. The Debtor has also admitted that he had a potential malpractice suit against his former legal counsel, Mr. Lowenbraun, and has admitted that he ran at least one business in addition to Health Heaven, which is the only business he disclosed at the section 341 meeting.

On January 27, 2009, the Debtor further revised his schedules. The Debtor amended Schedule B to disclose a joint interest in a Citibank VRESA with a value of $500. At no point did he disclose the $45,000 withdrawal from the account seven months prior to the filing. In the revised Schedule B, the Debtor disclosed a 16% interest in an entity called 474 Mc-Church Grocery and Newsstand, and clarified that he held 100% interests in Kuliwala (but only as a nominee) in addition to his interest in Health Heaven. He also disclosed for the first time, significant assets in the form of obligations owed to him by David Giuffrida ($30,000), Peter Devani ($20,000) and Saroj Patel ($15,000), and the legal malpractice claim against Solomon Lowenbraun, his former counsel. He also amended Schedule H to add Peter Devani as a co-debtor on monies owed to the Plaintiff's counsel. He also amended Schedule J to reduce his monthly first mortgage payment from $1,700 to $823.73. According to the Schedule F filed with the petition and amended on January 27, 2009, the Debtor scheduled approximately ten unsecured creditors who are owed an aggregate of $14,206.45.

On October 27, 2007, the Chapter 7 Trustee filed a notice of discovery of assets and a bar

date for the filing of claims was set for January 25, 2008.

The Plaintiff filed a claim on October 1, 2007, asserting a total claim of $281,311.45, of which $152,675.62 is asserted to be secured and $128,635.83 is unsecured. The attachment to the proof of claim shows that the Plaintiff holds judgments in the total amount of $143,112.56 including interest from the date of judgment.[7] The proof of claim also seeks to collect Plaintiff's counsel fees in the amount of $128,635.83, which were, according to the Plaintiff, awarded by the state court, but not yet reduced to judgment as of the date of the bankruptcy petition.

The Internal Revenue Service filed a proof of claim asserting a $1,451.33 priority claim and a $28.36 general unsecured claim. American Express filed an unsecured claim in the amount of $1,357.51 and LVNV Funding LLC, as assignee of MCI Resurgent Capital Services, filed an unsecured claim in the amount of $62.03. Total claims, aside from the Plaintiff's claim, equal $2,899.23.

## Pre-bankruptcy financial dealings of the Debtor

In order to analyze the allegations of the complaint and the Debtor's defenses it is necessary to understand the facts and circumstances leading up to the Debtor's bankruptcy filings in 2006 and 2007.

---

[7]     The Amended Judgment, dated November 1, 2006, awards principal amounts of $76,143.97 and $7,062.50 against the Debtor and Peter Devani jointly and severally, plus interest for a total of $98,328.28. Additionally, the Amended Judgment awards $42,380.35 as against the Debtor individually, plus interest for a total of $44,784.28. Grand total of the Amended Judgment as against the Debtor, by this Court's calculation, is $143,112.56, not $152,675.62. However, it is not necessary for this Court to determine the precise amount of the Plaintiff's claim in this adversary proceeding objecting to discharge. This is not a ruling on an objection to claim.

## *Health Heaven Inc.*

In August 2000, Plaintiff sold his business, Mrs. D's Natural Foods, Inc. ("Mrs. D's") for $90,000, to Peter Devani ("Devani"), who paid $14,000 down and promised to pay Plaintiff the balance by executing a $76,000 Note (the "Note") payable over time. At the time of sale, the Plaintiff also owned the building where Mrs. D's was located and continued as landlord of the premises pursuant to a written lease. Subsequent to this sale, Saroj Patel ("Patel") became a minority shareholder in Mrs. D's with Devani. In December 2002, Devani and Patel transferred ownership of Mrs. D's to Health Heaven, Inc. ("Health Heaven"), a corporation wholly owned by Devani and Patel.

On or about June 19, 2003, the Debtor purchased a 75% interest in Health Heaven, Inc. for $110,000 pursuant to a written sale agreement (the "June 19th Agreement"), which appears to have been written without the aid of legal counsel. The June 19th Agreement states that it is "[f]urther to the agreement of Shareholders of Health Heaven Inc. dated and signed by all shareholders on 3/08/03 ["2003 Agreement"] . . . ."[8] The purchase price under the June 19th Agreement was $100,000 payable as follows: "$25,000 (Twenty Five thousand) was invested by Mr. Parikh at the time of signing the previous contract. $60,000 (Sixty Thousand) at the time of Signing this contract, and the remainder of $25,000 after eight months from today . . . ." (Pl's Exh. 42; Transcript ("Tr.") 11/3/09 at 95). Pursuant to the June 19th Agreement, the Debtor assumed liability for the payment of rent and the repayment of the Note due to the Plaintiff. In addition, because Devani would still be personally liable to the Plaintiff for rental payments and for

---

[8]     The 2003 Agreement was not introduced into evidence, and the Debtor testified at trial that there was only a $25,000 deposit for which he was given a receipt, and that there was in fact no written agreement.

repayment of the Note, the Debtor agreed to be personally liable to Devani for those obligations. The June 19th Agreement also provided that Devani would retain ownership of the wholesale business of the "Specialty Breadsticks" and "MaxImuno Vitamin" lines but he would agree to sell this business to the Debtor "when he is ready" for a price of $25,000.

The Debtor testified that once he looked at the books and records of the company after the June 19th Agreement, he realized that Devani had misrepresented the financial condition of the company and he refused to complete the original deal. (Tr. 11/03/09 at 118-124). As a result, on June 30, 2003, Devani bought back 30% of the shares of Health Heaven from the Debtor "at a hefty price," leaving the Debtor with a 45% interest in the company ("June 30th Amendment"). Pursuant to another amendment to the June 19th Agreement, also executed on June 30, 2003, Devani agreed to contribute $15,000 to the business of Health Heaven, and waived (a) the $25,000 owed to him under the June 19th Agreement, (b) the $5,000 deposit owed to him, and (c) the sole rights to the Specialty Breadsticks and MaxImuno Vitamin whole sale lines - which would then be shared among the Debtor (45%), Patel (25%), and Devani (30%). (Pl's Exh. 42).

In exchange for the buy back, the Debtor agreed to invest $50,000 to improve the business of Health Heaven, and he agreed to repurchase the 30% interest from Devani for $50,000 within one year of the June 30th Amendment. At that time, the shareholders of Health Heaven – the Debtor, Patel and Devani – agreed that each would be entitled to make minimum monthly withdrawals from the company of $3,000, $2,000 and $3,000. (Pl's Exh. 42). The Debtor testified that he never received any monthly withdrawals, and is unsure if Patel or Devani received their monthly withdrawals. (Tr. 11/3/09 at 123-125).

When asked why he was willing to remain in the business despite Devani's "lies" and

misrepresentations and why he would commit himself to further capital investments and the

obligation to buy out Devani for an additional $50,000 within one year, the Debtor testified that

he had already sunk his $85,000 and wanted the $3,000 per month he was promised. (Tr. 11/3/09

at 121, 124). Despite this, the Debtor never sued or brought any legal action against Devani for

the non-payment of that monthly income.

At Devani's insistence, on or about July 1, 2003, the Debtor executed a guaranty of the

Note to Plaintiff ("Guaranty"). (Pl's Exh. 43; Tr. 1/21/10 at 89). The Debtor testified that he did

not read the Guaranty before he signed it, nor did he understand it. (Tr. 11/3/09 at 146-148).

Although the Guaranty created an obligation by the Debtor to the Plaintiff, the parties agree that

the Plaintiff never asked the Debtor to sign the Guaranty nor did the Plaintiff conduct an

investigation into, or rely upon, the Debtor's creditworthiness in connection with the Guaranty.

Rather, the Guaranty was executed in furtherance of the agreements between the Debtor and

Devani. (Tr. 11/3/09 at 147-148).

Despite the agreements among the parties which left Devani with a 30% interest in Health

Heaven and the Debtor a 45% interest, the Debtor claims that Devani was, up until July 2004, the

"controlling shareholder" primarily responsible for the bookkeeping and the operations of Health

Heaven. This was because the Debtor believed that Patel's 25% interest was merely held "as

nominee" for Devani, and that Devani therefore controlled a 55% interest. (Tr. 11/3/09 at 103-

105).

On July 20, 2004, the Debtor's brother, Pradip Parikh ("Pradip") purchased the remaining

55% interest in Health Heaven from Devani and Patel. Shortly thereafter, Pradip purchased the

real property on which the building is located from the Plaintiff for $640,000, including

repayment of $40,000 repayment of past due rent.

### *Mineola Health Food*

On August 20, 2004, a certificate of incorporation of Mineola Health Food, Inc.

("Mineola Health Food") was filed with the New York Department of State by accountant, H.K.

Koya, C.P.A., P.C. ("H.K. Koya") (Pl's Exh. 53; Tr. 11/3/09 at 152-154). On August 20, 2004,

two hundred shares of Mineola Health Food were issued to the Debtor. (Tr. 1/20/10 at 42-44).

That same day, the Debtor transferred all two hundred shares to his wife, Meena Parikh, for no

consideration. (Tr. 1/20/10 at 42-44). The Debtor disclaims any past or present ownership

interest in Mineola Health Food. (Tr. 1/20/10 at 42, 70). The Debtor testified at trial that he did

not sign a New York State S Corporation Election as "President" of Mineola Health Food and

that it must have been a forgery. The Debtor admitted that the corporation was treated as an S

corporation and he failed to explain how this document containing his social security number

was filed with the State with a forged signature or who may have forged it. The Debtor also

signed an Application for Registration as a Sales Tax Vendor. (Pl's Exh. 56 at 2, 3; Tr. 11/3/09

at 160). There is a receipt stamp on the document showing that it was filed with the State on or

around September 15, 2004. The Debtor testified that he signed the document, but that the

handwritten title "Owner" below his name was not written by him. The form itself asks for a list

of all owners and officers of the corporation and only the Debtor's name is listed.

The Debtor maintains that he completed the paperwork to incorporate Mineola Health

Food at his wife's request (Tr. 11/3/09 at 151-152; Tr. 1/20/10 at 49, 50), and the accountant,

H.K. Koya, mistakenly filed the initial corporate documents in his name instead of his wife's.

(Tr. 11/3/09 at 152; Tr. 1/20/10 at 44-45, 47). The transfer of shares to his wife, Meena, was intended to correct the accountant's mistake, but corrected applications and forms were never filed with the New York State.

Sometime during November of 2004, at a time when the Debtor owed 45% and his brother, Pradip, 55% of the company, Health Heaven ceased operating the business of Mrs. D's. (Tr. 11/3/09 at 132). The Debtor testified that the business was worthless when it went out of business and his brother, who was now the landlord, cleaned out the building. (Tr. 7/20/06 at 12-13; Tr. 1/20/10 at 41; Tr. 11/3/09 at 139). The Debtor testified that Pradip discarded Mrs. D's inventory, but he later testified that he did not know what happened to the inventory. (Tr. 11/3/09 at 142). Other than inventory, the Debtor testified that there was some old shelving, a cash register and a couple of refrigerators that were left in the building when Mrs. D's closed. (Tr. 11/3/09 at 138-139; Tr. 1/20/10 at 40-41). The Debtor testified that he gave the refrigerators to a company to try to sell and that they took the refrigerators with them. (Tr. 1/21/10 at 154-155). Despite this testimony, the Debtor and Meena both admitted that the refrigerators were left on the premises and later used by Mineola Health Food. (Tr. 1/20/10 at 41; Tr. 3/18/10 at 17; Tr. 11/3/09 at 144).

The Debtor testified that he closed Mrs. D's because Health Heaven owed large amounts of money and because it was worthless. He testified at trial that the business was never profitable. However, in December 2003, less than a year before the Debtor closed the business, the Debtor and the other partners of Health Heaven agreed to sell the premises and business for $940,000. (Pl's Exh. 45; Tr. 1/20/10 at 59). Considering that in August 2004, the real property was sold to the Debtor's brother for $600,000, that leaves a rough approximation of the value of

the business of about $340,000.

Sometime after Mrs. D's closed, Mineola Health Food began operating the same business at the same location, under the name Dave's Health Food & Vitamins ("Dave's Health Food").[9] The Plaintiff alleges that not only were Mrs. D's refrigerators being used in the operation of Dave's Health Food, but that there was inventory left by Mrs. D's that was being sold by Dave's Health Food. Lynda Ferguson, a friend of Plaintiff's counsel, testified at trial that she shopped at Dave's Health Food after Mrs. D's closed and there was inventory marked with price tags labeled with the name Mrs. D's or Health Heaven. This would contradict the Debtor's testimony that Mrs. D's inventory was worthless and discarded by his brother, Pradip. (Tr. 6/9/10 at 14-15).

The Debtor worked at Dave's Health Food store but claims he had no ownership interest in Mineola Health Food. Rather, he asserts that he was only an employee who worked an average of 40-45 hours per week. The Debtor claims he was paid a salary of $200 or $250 per week in cash by his wife, but Mineola Health Food kept no records of these payments. The only proof the Debtor was able to provide of the amount of his income was an affidavit signed by his wife. (Pl's Exh. 67, 68). Additionally, although the Debtor testified at his deposition in May of 2007 that he did not know if Mineola Health Food had a bank account and that he did not have

---

[9]     There is some disagreement about when the store began operating as "Dave's Health Food." The Plaintiff believes Dave's Health Food opened for business immediately after Mrs. D's closed. The Debtor argues that it was January 2005. In the May 18, 2007 deposition, the Debtor testified that the store owned by Health Heaven, Inc was operated as Dave's Health Food even before Health Heaven went out of business. (Ct. Ex. 2 at 7). At trial, the Debtor testified that the store was not called "Dave's Health Food" until opened by Mineola Health Food. (Tr 1/20/10 at 28). Nevertheless, the Debtor testified at trial that his brother opened an insurance policy for the store under the name "Dave's Health Food" in August 2004, three months before Health Heaven went out of business and 5 months before the Debtor claims Dave's Health Food began operating. (Tr. 1/20/10 at 29).

signatory authority, bank statements from Mineola Health Food's checking account from 2005

and Debtor's testimony at trial indicate that he signed several checks and that occasionally

checks were written to pay for his individual expenses. The Debtor claimed these payments were

made in lieu of his regular salary.

Dave's Health Food, which was operated by Mineola Health Food, continued in business

until August 2009. It is a stipulated fact that H.K. Koya and Shah and Pandya, C.P.A. were

accountants which supervised the books and records of the Debtor and/or his businesses within

two years prior to the bankruptcy filing.

The Debtor's Chapter 7 petition fails to identify any past or present ownership interest in

Mineola Health Food, or the transfer of its shares to his wife for no consideration.

### *Kuliwala Food*

On March 6, 2003, the Debtor signed an agreement to purchase a company called

Kuliwala Food Corp. ("Kuliwala") from Jang and Ranjit Singh for $65,000. Kuliwala operates a

Kennedy's Fried Chicken and Pizza business located at 168-18 Jamaica Avenue, Jamaica, New

York. (Tr. 11/2/09 at 110). On March 6, 2003, the Debtor was issued seventy percent of the

shares of Kuliwala, and the remaining thirty percent were issued to Harinder Kumar Nayyar

("Nayyar") (Pl's Exh. 61; Tr. 11/2/09 at 153). Despite holding seventy percent of the shares of

Kuliwala, the Debtor claims that he never held a beneficial interest in the company and he only

purchased the company as nominee for Nayyar as a favor to Nayyar, an immigrant who was not

able to obtain the necessary licenses to operate a food service business. (Tr. 11/3/09 at 152).

According to the Debtor he was never involved in the day to day operations of Kuliwala (Tr.

11/2/09 at 124); he does not have access to the books and records of Kuliwala (Tr. 11/2/09 at 140); and any personal funds he expended for the benefit of Kuliwala were repaid by Nayyar (Tr. 11/2/09 at 130-131).

The Debtor failed to disclose an ownership interest in Kuliwala in his chapter 13 case filed in 2006, and only filed an amended schedule disclosing a 70% interest in Kuliwala after the section 341 meeting. Despite having filed amended schedules disclosing his interest in Kuliwala, the Debtor failed to disclose any interest in Kuliwala in his original chapter 7 schedules. After the chapter 7 section 341 meeting, the Debtor filed an amended Schedule B to disclose his ownership interest in Kuliwala to which he ascribed a $0 value.

### *474 Mc-Church Grocery and Newsstand, Inc.*

In 2005, a shareholder's K-1 tax form was issued to the Debtor by an entity, McChurch Grocery & Newsstand, Inc. ("McChurch"), reporting that the Debtor owed a 15% interest in that company. (Pl's Exh. 63; Tr. 11/2/09 at 184). The Debtor claimed to have had no knowledge of his ownership interest in McChurch until 2006 when a copy of the K-1 was presented to him by an IRS agent at the section 341 meeting in his chapter 13 case. (Tr. 1/21/10 at 139-140). At different times during this case the Debtor testified that either his brother or his father owned McChurch (*Compare* Tr. 11/2/09 at 171, 188 *with* Tr. 1/27/09 at 34-36). The Debtor also testified that his father gifted him a 15% ownership interest in McChurch but that he returned the gift. (Tr. 11/2/09 at 189, 194-97). The record of this case is devoid of any evidence that the gift was returned. In any event, the Debtor claims that McChurch went out of business sometime in 2005 which is allegedly evidenced by the fact that McChurch's 2005 tax return is marked as a

"final return."

The Debtor's chapter 7 petition failed to identify any past or present ownership interest in McChurch. The Debtor amended his petition a year and a half after the petition was filed to disclose his interest in McChurch.

## *David Giuffrida*

In 2000,[10] the Debtor attempted to purchase an interest in a business called Internet Workstation from David Giuffrida ("Giuffrida"). According to the Debtor, Giuffrida did not complete the transaction and kept the Debtor's money without giving anything in return. The Debtor's attempts to sue Giuffrida were unsuccessful. (Tr. 1/20/10 at 192-194; Tr. 1/21/10 at 128-131).

At the time of trial, Debtor was still owed approximately $30,000, by Giuffrida, but the Debtor failed to disclose it on his petition or at the section 341 hearing.

## *Meera Management 3rd mortgage*

On February 28, 2006, subsequent to the entry of the Plaintiff's judgments against the Debtor, the Debtor and Meena obtained a $300,000 third mortgage ("Meera Mortgage") on their residence from Meera Managment LLC ("Meera Management") (Pl's Exh. 39). Meera Management is owned by the Debtor's brother, Pradip. Both the Debtor and Meena testified that

---

10       There is some inconsistency in the evidence as to when the transaction with Giuffrida took place. The Debtor testified under direct testimony that the deal with Giuffrida took place in 2003. On cross examination, the Debtor testified that he had been mistaken and the transaction had occurred in 2000. In either event, the result of the transaction is that Giuffrida owes the Debtor a substantial sum of money.

they received $300,000 in exchange for the Meera Mortgage. Although he testified that they obtained the Meera Mortgage to help pay bills and attempt to settle the Plaintiff's judgments, the Debtor admitted in the joint pre trial memorandum that the $300,000 allegedly received in consideration of the Meera Mortgage was deposited into Meena's personal account and she spent the funds without the Debtor's knowledge or consent, or any benefit to him.  Later, the Debtor testified at trial that only $150,000 was actually deposited into Meena's bank account, and that the other $150,000 in checks from Meera Management were never cashed. (Tr. 11/3/09 at 40). Alternatively, the Debtor testified that he and Meena did not retain any of the $300,000 proceeds of the Meera Mortgage, but rather they simply transferred the money back to Meera. (Tr. 11/3/09 at 43-44).

In January 2007, after the dismissal of the Chapter 13 case, but prior to the filing of the instant Chapter 7 case, Meera Management filed an action to foreclose the Meera Mortgage naming as defendants, the Debtor and Meena.  The Debtor defaulted in the foreclosure action, but Plaintiff interposed an answer and counterclaim to declare the Meera Mortgage an intentional fraudulent conveyance.  The Debtor opposed.

On June 13, 2007, the state court determined the Meera Mortgage to be an intentional fraudulent conveyance under New York's Debtor Creditor Law section 276 and found that the mortgage was void and part of a scheme to defraud the Plaintiff and/or hinder or delay his collection efforts.  (Pl's Exh. 39; Tr. 11/3/09 at 42).  The state court directed the Plaintiff to submit an order directing the Nassau County Clerk to set aside the Meera Mortgage.  In addition, the Plaintiff was awarded judgment against the Debtor, the Debtor's spouse and Meera Management jointly and severally for attorney fees of $7,575.  The state court order was signed

on July 31, 2007 – the same day the Debtor filed this bankruptcy petition. At trial, the Debtor testified that the Meera Mortgage had been an attempt to save their house.

The Meera Mortgage remains of record today because the entry of the judgment voiding the mortgage was stayed as a result of the automatic stay imposed by the bankruptcy filing.

The Debtor's chapter 7 petition failed to list the judgment voiding the Meera Mortgage, and failed to list Meera Management as a creditor holding a secured claim.

### Judgments awarded to Plaintiff

As a result of defaults in repayment of the Note related to the purchase of Health Heaven, the Plaintiff filed a motion for summary judgment in lieu of complaint in state court in July 2004. This lawsuit was filed at or around the same time the Debtor's brother, Pradip, purchased Devani and Patel's ownership in Health Heaven, and just prior to Pradip's purchase of the real property from the Plaintiff in August 2004. On October 21, 2004, the state court awarded the Plaintiff default judgment against the Debtor and Devani in the amount of $76,143.77 (Pl's Exh. 69; Tr. 1/21/10 at 82). In December 2004, the state court awarded Plaintiff an additional default judgment for attorney fees and other costs under the Note against the Debtor and Devani, jointly and severally, in the amount of $7,062.50.

In May 2005, the default judgments against the Debtor were vacated on the Debtor's motion based on allegations by the Debtor that his default was the result of neglect by his counsel. The Plaintiff appealed, and the Debtor cross-appealed. In December 2005, the Appellate Division reinstated the Plaintiff's judgment and dismissed the Debtor's cross-appeal. (Pl's Exh. 69; Tr. 1/21/10 at 82). The Appellate Division found that the Debtor had knowledge

of the default judgment against him for a substantial period of time, but only attempted to vacate the default judgment when served with a restraining notice. This was indicative of an intentional default, which, the court found, was not excusable. The Appellate Division also found that the trial court had erred in failing to provide for additional costs and attorney fees, as the broad language of the guarantee incorporated language of the promissory note providing for reasonable attorney fees and costs to enforce obligations of the Note. The Appellate Division remanded to the trial court to determine the Debtor's obligation for attorney fees and costs. Upon rehearing in the state trial court, the Plaintiff was awarded an additional judgment against the Debtor in the amount of $42,380.35 for attorney fees and other costs on March 14, 2006.

On March 16, 2006, the state court granted an order to show cause to punish the Debtor for contempt for court absence, for untimely, vague and conclusory answers to a questionnaire and for late and incomplete document production. The Debtor was given the opportunity to purge himself of contempt by appearing on April 21, 2006 and producing the deficient discovery items. On June 14, 2006, the Debtor was found to have partially complied, but had not yet had a full opportunity to purge the contempt. At the same time, an order was granted against the Debtor for contempt of court in his capacity as controlling owner of Health Heaven. The Debtor was given an opportunity to purge the contempt by appearing on July 25th and producing missing books and records. On April 3, 2007, the state court issued order of contempt and warrant of commitment against the Debtor directing that he be incarcerated until he complied with the order of contempt. The warrant was assigned to an officer in the sheriff's department in July 2007, just prior to the Debtor's bankruptcy filing.

On January 24, 2007, the state court awarded Plaintiff additional attorney fees and

expenses against the Debtor for ongoing expenses associated with the enforcement proceedings, and set a hearing to determine the amount of the award. This was never reduced to judgment because it was stayed by the filing of the instant chapter 7 case on July 30, 2007.

By all accounts, the lion's share of the Plaintiff's claim against the Debtor relates to Plaintiff's fees and expenses associated with collecting on the defaulted Note.

## Discussion

### *Dismissal as "bad faith" filing under section 707(a)*

The Plaintiff has sought dismissal of this bankruptcy case under section 707(a) principally, and seeks relief under section 727 denial of the discharge in the alternative.[11] The Plaintiff alleges that the Debtor's bankruptcy petition was filed in bad faith, and should be dismissed pursuant to Section 707(a).[12] Section 707(a) provides that:

> (a) The court may dismiss a case under this chapter only after notice and a hearing and only **for cause,** including--
>
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and

---

[11]    The Plaintiffs second and third causes of action under Section 523(a)(2) were withdrawn after the conclusion of the trial. The Debtor has asked the Court to "punish" the Plaintiff for his "frivolous conduct" and require him to pay the Defendants costs to defend the "bogus" Section 523 claims. (Debtor's Post-trial Brief at 3). The Court cannot find that the Plaintiff's position in this case "was not substantially justified" and therefore, declines to grant fees to the Debtor. 11 U.S.C. § 523(d).

[12]    The complaint in this case specifically seeks relief under section 707(a) only, not section 707(b). In 2005, section 707(b) was amended to allow cases where there are primarily consumer debts to be dismissed if the court finds that there has been an "abuse" of the provisions of the Bankruptcy Code by the debtor. The debts in the instant case, however, are not "primarily consumer" and the Plaintiff cannot avail himself of section 707(b).

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee.

11 U.S.C. §707(a) (emphasis added).

The moving party under section 707(a) bears the burden of proving "cause" by a preponderance of the evidence. *See In re Aiello*, 428 B.R. 296, 299 (Bankr. E.D.N.Y. 2010). There exists real disagreement among the circuit courts of appeal as to whether lack of good faith can or should be a basis for dismissal "for cause" under section 707(a). *Compare In re Perlin*, 497 F.3d 364 (3d Cir. 2007) (imposing good faith requirement); *In re Tamecki*, 229 F.3d 205 (3d Cir. 2000) (same); *Industrial Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124, 1129 (6th Cir. 1991) (same); *with In re Sherman*, 491 F.3d 948 (9th Cir. 2007) (finding chapter 7 has no explicit good faith requirement); *In re Padilla*, 222 F.3d 1184 (9th Cir. 2000) (same); *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994) (applying "narrow, cautious" approach to good faith requirement and requiring "extreme misconduct"). The Second Circuit Court of Appeals as of yet has not decided whether lack of good faith is a basis for dismissal for cause. However, this Court agrees with the well-reasoned case law within this District concluding that bad faith does in fact constitute cause for dismissal pursuant to section 707(a). *See In re Aiello*, 428 B.R. at 302 (citing *In re Lombardo*, 370 B.R. 506, 511 (Bankr. E.D.N.Y 2007)).

In general, the decision to grant or deny a motion to dismiss under section 707(a) is "guided by equitable considerations." *In re Smith*, 507 F.3d 64, 73 (2d Cir. 2007). The determination is within the sound discretion of the bankruptcy court and should be based upon

"whether dismissal would be in the best interest of all parties in interest." *In re Smith*, 507 F.3d at

73 (citing *Dinova*, 212 B.R. 437, 442 (B.A.P. 2d Cir. 1997)). The relevant factors generally

considered by courts when deciding whether or not to dismiss a case for bad faith are:

(1) the debtor's manipulations having the effect of frustrating one particular
creditor;

(2) the absence of an attempt to pay creditors;

(3) the debtor's failure to make significant lifestyle changes;

(4) the debtor has sufficient resources to pay a substantial portion of his debts;

(5) the debtor inflates expenses to disguise financial well-being;

(6) the debtor is overutilizing protections of the Bankruptcy Code to the conscious
detriment of creditors;

(7) the debtor reduced his creditors to a single creditor in the months prior to the
filing of his petition;

(8) the debtor filed in response to a judgment, pending litigation or collection
action; there is an intent to avoid a large single debt;

(9) the unfairness of the use of Chapter 7;

(10) the debtor transferred assets;

(11) the debtor is paying debts to insiders;

(12) the debtor failed to make candid and full disclosure;

(13) the debts are modest in relation to assets and income; and

(14) there are multiple bankruptcy filings or other procedural "gymnastics."

*In re Lombardo*, 370 B.R. at 512.

The Plaintiff need not prove each and every factor listed above in order to prove that a case

should be dismissed "for cause" but a combination of several factors is sufficient. *Id.*

The Plaintiff argues that the Debtor engaged in a six-year scheme to avoid repayment of his obligations to the Plaintiff. He goes on to argue that the Debtor filed this bankruptcy petition as part of a scheme to avoid satisfying his obligation on the judgments owed to the Plaintiff; the Debtor fraudulently transferred the equity in his home to his brother by way of the Meera Mortgage in order to shield that asset from collection by the Plaintiff; the Debtor fraudulently transferred $45,000 to his spouse in the months prior to the bankruptcy filing and also transferred his business interests in Mineola Health and Health Heaven to his spouse in 2004 and 2005, all at a time when the Debtor was aware of his liabilities to the Plaintiff; the Debtor knowingly and intentionally devised a plan of selective disclosure in this bankruptcy case in order discharge certain obligations and conceal certain assets in order to maintain the right to collect from third parties after the conclusion of the bankruptcy case; and he made knowing and fraudulent material omissions and misstatements in his petition, schedules, statements and testimony in this bankruptcy.

There has been no allegation that the Debtor lives an extravagant lifestyle or that his income is excessive. However, the Plaintiff believes the Debtor has the financial ability to pay the amounts owed to him. The Plaintiff argues that over the years the Debtor has retained and paid various legal counsel to represent him in these matters; the Debtor allegedly has over $300,000 equity in his home and is owed $65,000 by various people. Despite this seeming ability to repay the judgments, the Plaintiff alleges that the Debtor has made no attempt to do so. In his defense, the Debtor claims he made several offers to settle with the Plaintiff but these settlement offers were rejected. The Debtor also argues that any omissions or misstatements in

his schedules and statements were corrected and/or explained by the Debtor.

The Court finds that based on the totality of the facts and circumstances, that this Debtor engaged in fraudulent pre-petition conduct and transfers of assets which had the effect of frustrating the Plaintiff's collection efforts (Factors #1 and 10), the Debtor did not make any meaningful attempt to pay the Plaintiff (Factor #2), the Debtor filed this bankruptcy petition in response to the Plaintiff's collection efforts (Factor # 8), and the Debtor failed to make candid and full disclosure in this bankruptcy case (Factor #9).

First, at a time when the Plaintiff held significant judgments against the Debtor, the Debtor and his wife granted a $300,000 third mortgage – the Meera Mortgage – to an entity owned and controlled by his brother, Pradip which effectively wiped out any remaining equity[13] in the Debtor's residence in an attempt to shield that asset from collection. In a decision entered by the state court prior to the filing of the instant bankruptcy petition, the Meera Mortgage was avoided and found to be a fraudulent conveyance. In avoiding the Meera Mortgage, the state court found that the Debtor and his wife caused the third mortgage lien to be placed against their residence "[i]n order to shield the house from [Plaintiff]'s judgments" against the Debtor. (Pl's Ex. 39 at 1-2). The state court also found that "[i]t is instinct with implication that [the Debtor and his wife] never received $300,000 from [Meera], the [Meera Mortgage] was a sham and [Meera] and the [Debtor and his wife] continue to engage in a planned, calculated scheme to defraud and delay [the Plaintiff] from collection of his judgment." (Pl's Exh. 39 at 4). The court found that it was "clear and convincing" that the Meera Mortgage was "done with the intent to

---

[13]     The Debtor valued his residence at $525,000 in his petition and scheduled consensual first and second mortgage liens totaling approximately $200,000.

"hinder, delay or defraud" the Plaintiff. (Pl's Exh. 39 at 5). Although the state court found that the Debtor's conduct "was and continues to be frivolous and subject to the imposition of sanctions . . .," the court limited sanctions to the amount of the Plaintiff's attorney's fees, $7,575.

Second, this Court finds that the Debtor's incorporation and transfer of the shares of Mineola Health Food to his wife and subsequent transfer of the business of Health Heaven to Mineola Health Food was an attempt to shield the business assets from collection by the Plaintiff. The Debtor's testimony that he only incorporated the business for his wife's benefit, he never intended to have any ownership interest in Mineola Health, and was merely an hourly employee, rings hollow and is not credible for the following reasons. The business operated by Mineola Health Food was of the same nature and was operated out of the same location as the Debtor's prior business, Health Heaven. There is testimony to support a finding that Mineola Health Food was utilizing refrigerators and other equipment, and possibly even inventory, that was previously owned by Health Heaven. (Tr. 11/3/09 at 143-145; Tr. 1/20/10 at 37-41; Tr. 1/21/10 at 154; Tr. 3/18/10 at 17; Tr. 6/9/10 at 14-15). The chapter 7 petition reflects that Meena had been employed since about 1997 as a lab technician for New York City Health and Hospitals Corp. and it is unlikely that she was primarily responsible for the operation of the business; the vast majority of the checks written from Mineola Health Food's account appear to have been signed by the Debtor, not Meena; the Debtor signed more than one tax form involved with the incorporation of Mineola Health as either President or Owner of Mineola Health. (Pl's Exh. 55, 56). In addition, the accountant that prepared the incorporating documents for Mineola Health Food, H.K. Koya, testified that he never met with Meena in connection with the incorporation of the company. (Tr. 11/2/09 at 54). The Debtor's testimony that he completed all of the

incorporating paperwork of Mineola Health at his wife's request and it was the accountant's mistake to use the Debtor's name, is also highly dubious considering the facts and circumstances surrounding the transition of the business of Health Heaven to Mineola Health and the pending litigation against the Debtor by the Plaintiff.

Third, seven months prior to the filing of the instant petition, $45,000 was withdrawn from the Citibank VRESA account held by the Debtor and his wife. This is a home equity line of credit and therefore the withdrawal had the effect of decreasing or depleting the available equity in the Debtor's residence and increasing his monthly repayment expense.[14] The funds were deposited into the Debtor's wife's individual checking account at Washington Mutual. The Debtor claims that Meena made this withdrawal without his knowledge. (Tr. 3/18/10 at 34; Tr. 11/3/09 at 72-73). He claimed that she wanted to have the funds in case of an emergency and to pay bills (Debtor's Proposed Findings of Fact and Conclusions of Law ¶170). Meena testified that she needed that money in order to partially fund a $90,000+ settlement offer to the Plaintiff. (Tr. 3/18/10 at 35). However, the Court finds both of these explanations implausible because (a) Meena already had a $48,261 balance at the time the $45,000 home equity withdrawal was deposited into her account (Tr. 3/18/10 at 35), (b) the money was still in her account as of February 2007 and most likely continued to be held by Meena up until the Debtor's chapter 7 petition was filed (Tr. 3/18/10 at 37), and (c) the bank check supporting the $90,000+ settlement offer had already been funded and issued at the time the $45,000 withdrawal was made.

---

[14]     Exhibit 72 which contains certain statements from the Citibank VRESA account does not include statements from the relevant time period. However, the Court will take judicial notice that at the time of the Debtor's prior chapter 13 petition only $79,421 of the $125,000 available credit had been used. This left approximately $45,000 available on this credit line.

Furthermore, at no time did the Debtor disclose the $45,000 withdrawal from the account seven months prior to the bankruptcy filing. At the section 341 meeting, the chapter 7 Trustee questioned the Debtor specifically about withdrawals from his home equity line of credit. The Debtor testified that he took a second mortgage with Citibank in the amount of $100,000 and used the money in connection with his businesses. When questioned about any further withdrawals from his home equity line of credit, the Debtor testified that there were none. (Ct. Exh. 4 at 7). The Court finds that the most plausible explanation for the home equity withdrawal within seven months of the bankruptcy filing, given the totality of the facts and circumstances in this case, is that the Debtor and/or his wife withdrew the funds in order deplete the remaining equity and shield their residence from the Plaintiff's judgments.

Fourth, although the Court finds no basis to contradict the Debtor's assertion that he did make some attempts to *settle* the judgments with the Plaintiff, the record is barren of any evidence to support a finding that he made any attempt to *pay* the judgments in part or in full absent a full release of liability. In or about December 2006, the Debtor offered to settle the Plaintiff's judgments for a payment of $90,992.05. However, by this time, the Plaintiff's judgments exceeded $142,000 and the Plaintiff would not accept the settlement amount. By the Debtor's own admission, any funds offered to the Plaintiff by the Debtor to satisfy the judgments were settlement offers and thus conditioned upon a full release of the Debtor's liability without full payment. (Tr. 1/21/10 at 132-35). The Debtor has apparently taken issue with the fact that the portion of the judgments related to actual damages has been dwarfed by Plaintiff's legal fees in this case. (*See* Tr. 1/21/10 at 114-115). However, the Debtor fails to recognize that the lion's share of the legal fees are the direct result of the Debtor's own conduct and in any event have, in

large part, been reduced to a final judgment by the state court and are unassailable.[15] There is a

January 24, 2007 decision of the state court which highlights the Debtor's position and the error

in his assumptions that an offer to pay less than the full amount owed to Plaintiff should suffice:

> [The Debtor] contends that his willingness to now pay $87,798.60 together with
> interest from the date of judgment(s) will satisfy his monetary obligations to
> plaintiff rendering the enforcement proceedings, which he has thwarted, academic.
>
> Defendant, Parikh is in error. The two judgment entered on October 21, 2004 and
> December 3, 2004 total $83,206.47. In addition, there exists the award of
> $42,380.35 with interest as of March 14, 2006 . . . Further, there are fines
> outstanding from Parikh's two prior contempts totaling $100.
>
> Lastly, though the amounts have not yet been determined, plaintiff's entitlement
> to an additional award for on-going expenses associated with these enforcement
> proceedings has been granted . . .

(Attachment to Plaintiff's Proof of Claim).

The Court finds that the dramatic increase in the Plaintiff's claim above the actual

damages is the result of the Debtor's own conduct. His attempt to settle the valid pre-petition

state court judgments for less than the full amount and receive a release of liability in exchange,

is not an attempt to *pay* the judgments.

Fifth, satisfying another factor in the bad faith analysis, the Court finds that this chapter 7

---

[15]     The Debtor's conduct which has caused the increase in the Plaintiff's claim against him
began pre-petition and has continued post-petition. In November 2008, in connection
with Rule 2004 subpoena enforcement, Judge Eisenberg awarded the Plaintiff counsel
fees against the Debtor and his wife in the amount of "$6,758.10, due to their
representations that . . . documents produced were complete when in fact they were
incomplete and insufficient." In addition, the Debtor and his wife were sanctioned "at the
sum of $100 per day, to be paid to [the Plaintiff]" for every day as of the date of this
Order until they produce the documents demanded pursuant to the 2004 Subpoena
Examination Order, and the Supplemental Document Request, and appear for
examination at the place designated in the 2004 Subpoenas . . . ." (Case No. 07-72869,
Order, dated Nov. 4, 2008, Doc. #72). The Plaintiff was also awarded $2,470 expenses
and costs related to the Debtor and his wife's a discovery-related motion for
reconsideration. (Case No. 07-72869, Order, dated Nov. 4, 2008, Doc. #71).

petition was filed solely with the intention of avoiding Plaintiff's collection efforts and discharging the Debtor's personal liability on the Plaintiff's judgments. In the prior chapter 13 case, the Debtor did not schedule any unsecured debt. In the instant filing, other than the Plaintiff's claims, the Debtor scheduled approximately ten other creditors who are owed an aggregate of $14,000. Total claims actually filed, other than the Plaintiff's, equal only $2,899.23. The Debtor has, in the past, demonstrated that he has the resources to repay significant obligations, including legal counsel's fees,[16] despite his meager income. Sometimes it is a loan from his brother,[17] sometimes a payment by his wife, and sometimes contributions from various family members or a draw from a business.[18] The Court finds it unlikely that the Debtor's $14,000 in unsecured debt was a significant factor in his decision to file bankruptcy. Rather, this bankruptcy was filed solely to avoid liability to the Plaintiff.

---

[16]     The Debtor has had at least seven lawyers represent him in a variety of matters over the past several years: Heath Berger, Esq. (Tr. 11/2/09 at 92); Norman Langer, Esq. (Tr. 11/2/09 at 104); Steve Cohen, Esq. and Scott Cohen, Esq. (representing the Debtor and his wife, respectively) (Tr. 11/3/09 at 20); Marc Pergament, Esq. (Tr. 11/3/09 at 22-23); Solomon Lowenbraum, Esq. (Tr. 1/20/10 at 88); Norman Heller, Esq. (Tr. 3/18/10 at 63). With the exception of Mr. Lowenbraun, the Debtor did not schedule any outstanding obligations to these lawyers and none of these lawyers filed claims in the case.

[17]     The Debtor testified that his brother gave him $20,000 in 2003, and $90,000 to try to settle with the Plaintiff. (Tr. 1/21/10 at 112, 116). The Debtor also testified that additional funds were contributed by "friends and parents and everything." (Tr. 1/21/10 at 116).

[18]     The Debtor paid attorney fees directly from the checking account of Mineola Health Food. The Debtor testified at trial that checks were written from the Mineola Health Food checking account to pay personal expenses, particularly the costs of the civil litigation between the Debtor and the Plaintiff. The Debtor admitted to writing checks in the amounts of $760, $290, $795, $845.45 & $625 to pay Solomon Lowenbraum or other litigation costs. (Tr. 1/20/11 at 88-90, 93, 96). The Debtor alleges these checks were taken in lieu of his salary, although the total paid sometimes exceeds the Debtor's claimed monthly salary. (Tr. 1/20/11 at 90). Additionally, the Debtor admits that he had full access to all the money in the Mineola Health Food checking account. (Tr. 1/20/11 at 99-100).

Page 31 of 50

The finding that this bankruptcy was filed solely in order to discharge liability to the

Plaintiff is also supported by the Debtor's testimony at trial. In the context of a discussion of

why the Debtor did not schedule as an asset approximately $35,000 in debt owed to him, the

Debtor testified that he was advised by his prior counsel, Mr. Lowenbraun, that he should

"finish" the case with the Plaintiff first before pursuing claims for money owed to him. The

record of the Debtor's testimony is as follows:

> THE COURT: People owe you the money. You don't schedule that they owe you
> the money during your 13. You don't pursue it.
>
> THE WITNESS: I asked Mr. Lowenbraun to pursue this thing. Lowenbraun says
> finish Mr. Desiderio's case, then we can go after this person, but –
>
> THE COURT: Finish with this creditor and then you'll go after and collect your
> money?
>
> THE WITNESS: Right. I did ask Mr. Lowenbraun.
>
> . . .
>
> THE COURT: Is it your testimony that you had discussed with Mr. Lowenbraun -
> - is that his name?
>
> THE WITNESS: Yes.
>
> THE COURT: With Mr. Lowenbraun what questions you would answer and what
> questions you wouldn't answer?
>
> THE WITNESS: Lowenbraun said to me, "Finish Mr. Desiderio's case first" at the
> time. We –
>
> . . .
>
> THE COURT: Did you and Mr. Lowenbraun discuss that you would answer
> certain questions and not answer, for whatever reason, other questions?
>
> THE WITNESS: Yes. He says to me.
>
> THE COURT: Is your answer yes?

THE WITNESS: Yes.

(Tr. 1/21/10 at 30, 37-38).

The Debtor's testimony regarding his intentional and knowing failure to be candid and forthright in his bankruptcy disclosures leads the Court to its final finding in support of section 707(a) bad faith dismissal. As will be discussed in further detail in the context of the section 727(a)(4)(A) analysis, the Debtor has without question exhibited a reckless disregard for the veracity of the information contained in his petition, schedule and statements such that this Court can only conclude that the omissions and misstatements contained in the Debtor's written filings and in his section 341 meeting testimony was material, knowing and done with fraudulent intent.

For all of these reasons the Court finds that the Plaintiff has established by a preponderance of the evidence that the Debtor's actions provide the basis for this Court to conclude that a bad faith dismissal under section 707(a) is warranted. The Plaintiff prefers that this case be dismissed and that the Court's analysis conclude with a "bad faith" finding. However, in order to dismiss a case under section 707(a), the Court must find, in the exercise of its sound discretion, that dismissal would be in the best interest of all parties in interest. *See In re Smith,* 507 F.3d at 72. This requires further analysis.

Although the elements of proof under sections 707(a) and 727(a) overlap in some instances, the consequences are vastly different. If the Court relied upon its section 707(a) finding and dismissed the case, it is true that the Debtor would not receive a discharge, however there would be no continuing inquiry into the Debtor's financial affairs by the chapter 7 trustee,

and there would be no administration of the case for the benefit of creditors.[19] All property of the estate currently held by the chapter 7 trustee for the benefit of creditors would be returned to the Debtor or the entity which held the property prior to the bankruptcy filing. More troubling in a case such as this, the Debtor would be free to re-file a petition under any chapter of the Bankruptcy Code at any time with no impediment to receiving a discharge of the very same debts that are the subject of the instant bankruptcy case. In the alternative, if the case remains open then the Debtor and any assets that could be administered for the benefit of creditors would remain under the control and direction of the chapter 7 Trustee and the Court. In addition, if the Court chooses not to dismiss the case it can then examine the Plaintiff's section 727 causes of action and determine whether the Debtor has engaged in the type of conduct which Congress has determined should be redressed by denial of the discharge. If the discharge is denied under any of the provisions of section 727(a)(2) through (6), the Debtor would be precluded from receiving a chapter 7 discharge in a subsequent case filed within one year, 11 U.S.C. §727(a)(7), and any debt that the Debtor scheduled or could have scheduled in this case would be non-dischargeable in any future bankruptcy filing by the Debtor. *See* 11 U.S.C. § 523(a)(10).

Sections 727 and 707 are also distinct in that section 727 is a statute requiring very specific findings regarding a debtor's conduct which results in the imposition of the severe penalty of denial of the discharge. Section 707(a), on the other hand, is a more general section which is more subjective in its application resulting in much less severe consequences to a debtor. The enumerated bases for "cause," although not limiting, do not address bad faith

---

19      The Court is unclear as to the efforts of the chapter 7 trustee to administer assets, but notes that the chapter 7 trustee filed a report of discovery of assets on October 25, 2007.

conduct. Rather, the "bad faith" element under section 707(a) has been implied under the standard of "cause" through judicial application.

The Court finds that despite the Plaintiff's preference of remedies, this case should not be dismissed for the following two reasons. First, the Court must find that dismissal is in the best interests of all parties in interest. "The best interest of the debtor 'lies generally in securing an effective fresh start upon discharge and in the reduction of administrative expenses leaving him with resources to work out his debts.'" *See In re Smith*, 507 F.3d at 72 (citing *Dinova*, 212 B.R. at 441). However, based on the facts and circumstances surrounding this bankruptcy filing, the Court finds that the Debtor is not the "honest but unfortunate debtor" that the Bankruptcy Code's "fresh start" was intended to help. *See Grogan v. Garner*, 498 U.S. 279, 287-88 (1991). The Court also does not believe that if this case were dismissed, the Debtor would have any intention of repaying the obligations scheduled in the petition, but rather, that he would continue to evade collection efforts and possibly even file another bankruptcy petition in the future.

On the other hand, the interest of creditors generally is to be repaid as expediently as possible and "to subject the debtor's property to the supervision of the Court and the control of a Chapter 7 trustee and to the fair and orderly administration of the debtor's estate." *Dinova*, 212 B.R. at 441. While it is never a certainty that a chapter 7 trustee will be successful in gathering estate assets for distribution to creditors, the Court finds that this bankruptcy case should remain open to allow the opportunity for that to happen with all of the powers and duties afforded to a trustee under the Bankruptcy Code.

The Court also finds that it is in the best interest of all parties in interest that the Court ensure the integrity of the bankruptcy process. *See Marrama v. Citizens Bank of Mass.*, 549 U.S.

365, 376 (2007) (noting that bankruptcy judges have "broad authority . . . to take any action that is necessary or appropriate 'to prevent an abuse of process' described in § 105(a) of the Code"). In this case that interest is best served by keeping this case open and under the direct scrutiny of the trustee and oversight of the Court.

Second, the Court finds that where a section 727(a) remedy is available and appropriate under the facts, the Court should forego a finding of bad faith, and the resulting section 707(a) dismissal, in favor of the more specific statute for the reasons as stated above. The Court is cognizant of the argument presented by some courts against finding bad faith as a basis to dismiss under section 707(a). Specifically, there is a line of cases which find that the amendments to the Bankruptcy Code in 2005 which inserted a "bad faith" analysis to the Bankruptcy Code in section 707(b), related to consumer debtors, necessarily means that Congress intended to exclude a bad faith analysis under section 707(a). *See In re Adolph*, 441 B.R. 909 (Bankr. N.D. Ill. 2011), and the cases cited therein. Other courts have rejected the bad faith analysis under section 707(a) on the basis that bad faith conduct by a debtor is more appropriately addressed under the more specific provisions of section 727. *See, e.g., Sherman v. SEC (In re Sherman)*, 491 F.3d 948, 970-74 (9th Cir. 2007). The Court does not believe that Congress intended to exclude bad faith from a section 707(a) analysis by specifically including it in section 707(b). Rather, the Court finds that where a section 727(a) remedy is not available to the Court, it is entirely appropriate to consider a debtor's "bad faith" conduct in deciding whether to dismiss a case. The Court must have the ability to redress a debtor's bad faith conduct and if there is no other more appropriate remedy available to the Court, then it is appropriate to dismiss under section 707(a). *See Marrama*, 549 U.S. at 376.

Because this Court has been presented with claims under section 727(a), the Court will continue its analysis with respect to those causes of action.

## *Denial of Discharge under 11 U.S.C. 727*

It is well-settled law that the denial of a debtor's discharge is a drastic remedy that must be construed strictly in favor of the debtor. *See State Bank of India v. Chalasani (In re Chalasani)*, 92 F.3d 1300, 1310 (2d Cir. 1996). However, a discharge under section 727 is a privilege, not a right, and may only be granted to the honest debtor. *See Congress Talcott Corp. v. Sicari (In re Sicari)*, 187 B.R. 861, 880 (Bankr. S.D.N.Y. 1994). The plaintiff bears the burden of proof of establishing each of the elements of section 727 by a preponderance of the evidence. *See In re Silverstein*, 151 B.R. 657, 660 (Bankr. E.D.N.Y. 1993); *see also* Fed. R. Bankr. P. 4005.

## *False Oath or Account – 11 U.S.C. § 727(a)(4)(A)*

In the sixth cause of action of the complaint, the Plaintiff seeks to deny the Debtor's discharge pursuant to section 727(a)(4)(A). Under this section, the Plaintiff must prove by a preponderance of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *See In re Murray*, 249 B.R. 223, 228 (E.D.N.Y. 2000).

The burden of showing actual fraudulent intent falls on the shoulders of the party objecting to the debtor's discharge. *See In re Smorto*, 2008 WL 699502, at *4 (E.D.N.Y. Mar. 12, 2008). "Once the [plaintiff] has produced persuasive evidence of a false statement, the burden shifts to

the debtor to come forward with evidence to prove that it was not an intentional misrepresentation or provide some other credible explanation." *See In re Gardner*, 384 B.R. 654, 662-63 (Bankr. S.D.N.Y. 2008) (citations omitted).

Materially false statements made or omitted as part of the bankruptcy petition, schedules, at an examination or during the proceedings themselves may constitute false statements under oath for purposes of section 727(a)(4)(A). *In re Abramov*, 329 B.R. 125 (E.D.N.Y. 2005). The petition, schedules and statements submitted by the debtor are "unsworn declarations made under penalty of perjury and are, according to federal law, the equivalent of a verification under oath" that the information contained in those documents is true and correct. *Smith v. Grondin (In re Grondin)*, 232 B.R. 274, 276 (B.A.P. 1st Cir. 1999).

It is crucial for the successful administration of the estate for the debtor to provide truthful information in connection with the bankruptcy case. *See In re Dubrowsky*, 244 B.R. 560, 572 (E.D.N.Y. 2000). "[T]he very purpose of . . . § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction . . . ." *Boroff v. Tully (In re Tully)*, 818 F.2d 106, 110 (1st Cir. 1987).

It is not enough under section 727(a)(4)(A) that a debtor is merely careless in the preparation of documents to be filed with Court, or in his testimony in connection with the case. The omissions must rise to the level of showing fraudulent intent. *In re Gollomp*, 198 B .R. 433, 437 (S.D.N.Y.1996). Fraudulent intent "may be inferred from a series of incorrect statements and

omissions." *In re Smorto*, 2008 WL 699502, at *21; *Sicherman v. Rivera (In re Rivera)*, 2007 WL 130415, at *5 (B.A.P. 6th Cir. Jan. 11, 2007) ("[T]he Debtor's 'whole pattern of conduct' can support a finding of fraudulent intent."); *In Re Murray*, 249 B.R. at 229. If a debtor is found to have exhibited a "reckless indifference to the truth," then that may be enough to establish fraudulent intent sufficient to deny the discharge. *See Diorio v. Kreisler-Borg Constr. (In re Diorio)*, 407 F.2d 1330 (2d Cir. 1969) ("Successful administration of the Bankruptcy Act hangs heavily on the veracity of statements made by the bankrupt . . . . Statements called for in the schedules, or made under oath in answer to questions propounded during the bankrupt's examination or otherwise, must be regarded as serious business; reckless indifference to the truth . . . is the equivalent of fraud.") (citations omitted); *In re Dubrowsky*, 244 B.R. at 571-72.

Finally, the omissions and/or misstatements by a debtor also must be material. However, "any matter bearing on the discovery of estate property or the disposition of the debtor's property is material for purposes of § 727(a)(4)(A)." *In re Abramov*, 329 B.R. at 134.

The Plaintiff argues that the Debtor knowingly and fraudulently omitted or misstated the following material information from his bankruptcy petition and schedules, or only disclosed the information after being questioned at the section 341 meeting:[20]

• Ownership interest in Kuliwala

• Ownership interest in McChurch

• Ownership interest in Mineola Health Food

• Claims the Debtor held against by Devani, Patel and Giuffrida

---

[20]     The Plaintiff has actually alleged a broader list of material omissions. This Decision will only focus on these few which are the most striking.

- • $45,000 withdrawal from Citibank VRESA
- • Shah & Pandya, CPA, as accountant for the Debtor
- • $1,700 first mortgage payment listed in Debtor's expenses

The Plaintiff argues that these misstatements or omissions were repeated by the Debtor when he gave false, misleading and/or contradictory testimony under oath at the section 341 meeting of creditors.

## *Failure to disclose business interests*

The Court finds that the Debtor failed to disclose ownership interests in at least one business in which he held an ownership interest, and failed to list names of businesses he was an officer, director, etc of within the six years prior to the bankruptcy filing. Item 13 of Schedule B (Personal Property) requires a debtor to disclose any "stock interests in incorporated and unincorporated businesses" and ascribe a dollar value to the debtor's interest in that business. Question 18 of the official form Statement of Financial Affairs requires the Debtor to "list the names, addresses, taxpayer identification numbers, nature of businesses, and beginning and ending date of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sold proprietor, or was self-employed in a trade, profession, or other activity either full-or part-time within the six years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the six years immediately preceding the commencement of this case."

The only business interest disclosed by the Debtor in his initial chapter 7 filing, on

Schedule B, was his interest in Health Heaven, to which the Debtor ascribed a value of $0. The

Debtor did not disclose *any* business interests in response to Question 18 of the Statement of

Financial Affairs. At the section 341 meeting on September 5, 2007, the Debtor testified that he

had never been self employed or engaged in his own business. Upon further questioning, the

Debtor admitted at the section 341 meeting that he owned a 45% interest in Health Heaven, but

affirmatively denied being engaged in any other businesses. (Ct. Exh. 4 at 8-9). The Debtor only

disclosed his interest in Kuliwala when he filed amended schedules on September 17, 2007,

presumably in response to questioning at the section 341 meeting. The Debtor did not disclose his

interest in McChurch until about a year and a half after filing the initial petition, on January 27,

2009. At no time did the Debtor disclose his interest, past or present, in Mineola Health Food.

At trial, the Debtor admitted that this testimony and schedules as originally filed were false

and he admitted to owning an interest in Kuliwala and also having owned and operated a

computer repair business called Davenil Consulting in the past.[21] (Tr. 11/2/09 at 102-103, 110).

The Debtor also admitted that Mineola Health Food was incorporated in his name and that he

owned it prior to the transfer to his wife for no consideration. Nevertheless, Mineola Health Food

was not disclosed in his petition. (Tr. 11/3/09 at 151-152, 157; Tr. 1/20/10 at 43-44).

The Court finds that the Debtor's initial failure to disclose any interest in Kuliwala was

knowing and intentional, or at the very least reckless, considering that he had filed amended

schedules in his chapter 13 case less than one year prior to filing the chapter 7 petition which

indicated he owned a 70% interest in Kuliwala. Similarly, the Court finds that the Debtor's

---

[21]     Arguably, the failure to disclose his interest in Danevil is excused by the Debtor's
         assertion that the business ceased operating more than six years prior to the bankruptcy
         filing.

failure to disclose any interest in McChurch was also knowing and intentional, or reckless, because the Debtor clearly was on notice of this interest since July 2006 when, at his section 341 meeting in the prior chapter 13 case, he was shown the K-1 issued to him on account of his ownership interest in that business. (Ct. Exh. 1 at 15). Finally, the Court believes that the Debtor knowingly, intentionally, or at the least recklessly, failed to disclose his interest in Mineola Health Food, even if it was, as the Debtor asserts, only an interest he held briefly. The bankruptcy petition, schedules and statements require full and complete disclosure. It is not for the Debtor to make a qualitative analysis as to whether a business interest is of sufficient value or duration to warrant disclosure. *See In re Bressler*, 387 B.R. 446, 461 (Bankr. S.D.N.Y. 2008) (suggesting that the debtor's duty is to "provide[] reliable information to those who have an interest in the administration of the estate," rather than to evaluate what assets have value enough to be reported).

### *Failure to disclose claims against third parties*

The Court finds that the Debtor, through his petition, schedules and testimony, failed to disclose significant sums of money owed to him by third parties. At the section 341 meeting, the Debtor testified that he was not owed any money. However, at trial the Debtor admitted that he was paying the entire costs of Health Heaven, even though he was only a 45% owner, and testified that he is owed $20,000 by Devani and $15,000 by Patel for their proportionate share of the expenses of operating Health Heaven. (Tr. 1/21/10 at 25, 27-28). Additionally, the Debtor admitted that he was owed $30,000 by Giuffrida for the purchase of the internet workstation business which Guiffrida failed to turn over. (Tr. 1/20/10 at 192-194). The Debtor only disclosed

these debts in amended schedules filed a year and a half after the initial bankruptcy filing, apparently after the debts were discovered by the Plaintiff.

Based on the Debtor's own testimony, quoted earlier in this decision, the Court finds that the Debtor's initial failure to disclose these assets was intentional and part of a plan to selectively disclose assets in the bankruptcy case and maintain the right to collect from third parties for his own benefit.

*Other miscellaneous omissions*

The Plaintiff argues that the Debtor's failure to disclose any interest in any bank accounts in his original chapter 7 petition supports the cause of action under section 727(a)(4)(A) in that such omission from the schedules was knowing and fraudulent. Question 11 of the official form Statement of Financial Affairs requires the Debtor to "[l]ist all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold or otherwise transferred within one year immediately preceding the commencement of this case, . . . [i]ncluding checking, savings, or other financial accounts, certificates of deposit, or other instruments." The Debtor listed "None." He testified at trial that he did have Citibank checking account which was open within one year of the bankruptcy filing, but he did not disclose it because it had been frozen prior to the bankruptcy and he did not have access to those funds. (Tr. 11/3/09 at 86). He also testified that he had checking and savings accounts at Chase Bank but those accounts had a $0 balance as of July 2006 and were in fact closed. (Tr. 11/3/09 at 85 - 92; Pl's Exh. 31).

Even if the Court were to credit the Debtor's testimony and find that the Chase account

was closed prior to one year before the chapter 7 filing [22] and therefore did not need to be disclosed, the Court cannot condone the Debtor's failure to list the Citibank checking account. The question posted to all debtors in the statement of financial affairs is whether the debtor had any financial account or instrument held in its name which was "closed, sold or otherwise transferred within one year immediately preceding the commencement of the case." The question is purely objective and does not allow for any qualitative analysis as to whether there is any value to the account worth reporting because, for example, the account was frozen. In addition, if the Debtor's real reason, other than recklessness, was that the account was frozen, then he should have reported this in response to Question 4(b) of the statement of financial affairs which requires a debtor to "[d]escribe all property that has been attached, garnished or seized under any legal or equitable process within one year immediately preceding the commencement of this case." The Debtor answered "None" to this question which belies his explanation for failing to disclose the Citibank account in response to Question 11.

The Plaintiff also argues that the Debtor knowingly and intentionally misrepresented his monthly payment on his first mortgage in Schedule J to the petition as originally filed. The Debtor's petition showed mortgage payments of approximately $1700 a month for the first mortgage and $880 a month for the second mortgages. This represents a significant increase in the payments the Debtor had indicated in his prior bankruptcy. At the section 341 meeting, the Debtor explained that he was paying these higher amounts because of increased interest rates. (Ct. Exh. 4 at 35). However, at trial the Debtor confirmed that he was only paying $823.73 on the

---

[22]    Although the Debtor testified that the account was closed prior to one year before the bankruptcy filing, he admitted that he did not maintain any account statements from Chase which would show that the account was closed. (Tr. 11/3/09 at 92).

first mortgage and that the payment for the second mortgage never exceeded $870 in the three months preceding his filing. Plaintiff's Exhibit 71 introduced at trial are the Debtor's monthly first mortgage statements for the months leading up to the bankruptcy filing which confirm that the Debtor's monthly payment amount was $823.73 at that time. The Debtor's Schedule J as originally filed, therefore, was a complete fabrication. At trial, the Debtor's explanation for the error was that he did not carefully review the petition because he was under stress at the time (Tr. 11/3/09 at 81).

The Plaintiff also cites the Debtor's failure to disclose accountants that did work for him within the two years preceding the bankruptcy. Question 19 of the Statement of Financial Affairs requires the Debtor to "[l]ist all bookkeepers and accountants who within two years immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor." This question is intended to assist the trustee in his investigation into a debtor's financial affairs. The Debtor listed Shah & Pandya CPA in Schedule F as having a $4,000 claim against him for services rendered. Plus, the Plaintiff's Exhibit 29 shows that Shah & Pandya prepared tax returns for the Debtor within two years of the bankruptcy filing. Despite this, the Debtor failed to list them in response to Question 19 of the Statement of Financial Affairs as originally filed. They were only added to the statement of financial affairs in the Debtor's second amendment of his petition, on January 27, 2009.

As to all of the above omissions and/or misstatements, the Debtor claims that they were merely inadvertent mistakes and in any event were immaterial. He also argues that these inadvertent, immaterial omissions were made because he was under threat of arrest as a result of the warrant of commitment issued by the state court proceeding as a result of the Plaintiff's

vexatious collection efforts. The Debtor testified that he feared leaving his house and signed his petition without proper review. The Debtor contends that his amendments to the petition to reflect some of the misstated information is an indication that the mistakes were made in good faith. He also argues that some of these omissions/misstatements can be explained by the Debtor's lack of sophistication and the fact that English is not his first language. Finally, the Debtor argues that the Plaintiff should be judicially estopped from arguing that the Debtor has undisclosed assets because the Plaintiff had previously admitted in related court proceedings that the Debtor had no recoverable assets.[23]

The Court will address these defenses in reverse order. The Debtor's judicial estoppel argument is entirely misplaced and is an inappropriate attempt to shift the focus of the Court's analysis away from the Debtor and onto the Plaintiff. The fact that the Plaintiff may have represented to another court that the Debtor did not own any significant assets against which he could recover, does not excuse the Debtor's conduct in this case. The Plaintiff's knowledge or lack of knowledge of a debtor's assets is not an element of a section 727(a)(4)(A) cause of action and should not be read into the statute. The focus should remain on the Debtor's conduct.

The Court finds that the Debtor's substantial failure to be truthful in his schedules,

---

[23] In 2004, the Plaintiff sued his former attorney, Marjorie Weinroth, Esq., for malpractice for failing to conduct due diligence with respect to the documentation of the transactions underlying this case. In opposition to Ms. Weinroth's motion for summary judgment, the Plaintiff testified by sworn affidavit that "Parikh owns no significant assets that I can move against" and that his attorney "has done everything conceivable under the law to enforce the judgment, to no avail." At the time the Plaintiff completed the affidavit, he had seen and reviewed the Debtor's current bankruptcy petition. The Debtor contends that the Plaintiff, who has taken the position that the Debtor is "judgment proof," cannot now be permitted to attempt to deny the discharge or dismiss the bankruptcy case based on allegations that the Debtor concealed or intentionally misstated information when Plaintiff already knew the misstated information and had declared the Debtor judgment proof anyway.

statements and section 341 meeting testimony, is not excused by his alleged lack of sophistication

or inability to understand the English language. *See In re Smorto*, 2008 WL 699502, at \*5

(E.D.N.Y. Mar. 12, 2008) (suggesting that the Court is permitted to consider the financial

sophistication of the Debtor among other factors in determining fraudulent, but does not excuse

the Debtor's lies) (citing *In re Murray*, 249 B.R. at 232-33). This finding is based on (a) the facts

of this case, including the fact that the Debtor has lived in this country for more than twenty years,

was educated in "electronic engineering" at a school in Houston, Texas, and has been in business

for himself or with partners at least since 2001, (b) the Court's assessment of the Debtor's

demeanor and ability to answer questions and testify at trial, and (c) the pervasive nature of the

Debtor's misrepresentation and omissions. Neither is the Debtor's conduct excused by his

subsequent amendments to the petition a year and a half after the original

misrepresentations/omissions were made. Amendment of the petition does not necessarily negate

fraudulent intent. *See Weiss v. Winkler*, 2001WL 423050, \*3 (E.D.N.Y. Mar. 30, 2001); *see also

In re Tabibian*, 289 F.2d 793 796-97 (2d Cir. 1961) (amendment of the petition does not cure the

prior omission, but may be considered some evidence of innocent intent); *In re Spitko*, 357 B.R.

272 (Bankr. E.D. Pa. 2006) ("[A] debtor's subsequent amendments to her schedules may rectify an

honest mistake, but cannot expunge any fraud in the falsity of an oath on the original schedules.").

Nor is it excused by his alleged rush to file the petition and his anxiety associated with the threat

of incarceration. The Debtor's argument tries to paint the Debtor's omissions as a series of honest

mistakes made because of the rush to file the petition to avoid being arrested pursuant to the

warrant of commitment. However, a statement made with made with reckless disregard for the

truth is made with knowledge of its falsity. *In re Maletta*, 159 B.R. 108, 112 (Bankr. D. Conn.

1993). The Debtor's failing to read or review his petition before filing constitutes reckless disregard for the truth. If the Debtor had completed the petition under time constraints and without proper (or any) review, the proper time to review and amend the petition would be soon after it was filed, not a year and a half later in response to allegations by a creditor. *See In re Searles*, 317 B.R. 368, 377 (B.A.P. 9th Cir. 2004) ("[P]rompt correction of an inaccuracy or omission may be evidence probative of lack of fraudulent intent."). Instead, the Debtor failed to correct misstatements in a timely manner, and continued with his misstatements and omissions at the section 341 meeting, showing that they were not honest mistakes. The Debtor was represented by counsel in preparing the bankruptcy petition and schedules and at the section 341 meeting and had ample opportunity to address the mistakes in a timely manner, but chose not to do so.

Having considered the totality of the circumstances in this case, as well as the Debtor's testimony and demeanor at trial, and the facts presented to the Court through the Debtor's testimony as well as the documentary evidence, the Court finds that the Debtor's discharge should be denied under section 727(a)(4)(A). The Debtor's petition, schedules and section 341 meeting testimony are replete with false statements that the Debtor knew were false. The Debtor claims that the omissions were inadvertent. However, fraudulent intent is rarely admitted by a debtor. As such intent can be established by circumstantial evidence or by inferences drawn from a course of conduct. *See Dubrowsky*, 244 B.R. at 572-73. Taken individually, each of the Debtor's misstatements and omissions may seem benign and subject to explanation. However, taken together with the whole of this case, the Debtor's conduct at best shows a reckless disregard for his obligations to present truthful disclosure of his financial affairs. At worst, the Debtor's omissions were knowingly and intentional. In either event it supports the Court's finding that his

conduct taken in the aggregate supports a finding under section 727(a)(4)(A). The Court finds it implausible that the Debtor did not recall the omitted and misstated information. The Court finds it far more likely that the Debtor intended to conceal information from the Trustee, either through his misstatements or omissions.

The Debtor's conduct in this case had been misleading to the Trustee and has obstructed the administration of this estate. The information elicited from debtors in the petition, schedules and statement of financial affairs, as well as a trustee's questions at a section 341 meeting are directly targeted to elicit information relevant to the administration of the estate for the benefit of creditors. The proper functioning of the bankruptcy system relies, in large part, upon a debtor's truthful response to each and every questions presented to him.

For all of the foregoing reasons, the Court finds that the Plaintiff has proven his claim under section 727(a)(4)(A) and the Debtor's discharge will be denied on that basis.

## *Transfer or Concealment of Property - 11 U.S.C. § 727(a)(2)(A)*

In the fourth cause of action of the complaint, the Plaintiff seeks to deny the Debtor's discharge pursuant to section 727(a)(2)(A). Under this section, the Debtor's discharge should be denied if the Debtor – with intent to hinder delay or defraud creditors – transferred or concealed property of the Debtor within one year prior to filing. The Court finds, based on the totality of the circumstances in this case, that the transfer of the $45,000 from the Debtor's joint Citibank VRESA to his wife within the year prior to this bankruptcy filing was done with the intent to hinder, delay or defraud creditors. In connection with its section 707(a) findings earlier in this Decision, the Court found that it is entirely plausible that the transfer of $45,000 from the joint

home equity line to the Debtor's wife's account, depleting the equity in their home, was done with fraudulent intent and at a time when the Debtor owed the Plaintiff a significant amount of money. Those findings apply equally with respect to the section 727(a)(2)(A) cause of action, and the discharge will also be denied on that basis.

### *Conclusion*

Having denied the discharge under two separate subsections of section 727(a), the Court declines to analyze the remaining causes of action alleged by the Plaintiff in the Complaint.

For the reasons stated herein, the Plaintiff's motion to dismiss is denied. Judgment will enter in favor of the Plaintiff and the discharge is denied under section 727(a)(4)(A) and (a)(2)(A).

A separate order consistent with this Decision will enter forthwith.

Dated:    Central Islip, New York
          May 24, 2011

Hon. Robert E. Grossman, U.S.B.J.